Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 1129 | **DATE** | 11/21/2000 |
| **CASE TITLE** | IN RE: GENERAL INSTRUMENT CORPORATION SECURITIES LITIGATION | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for partial summary judgment against the Class is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | NOV 2 2 2000 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | 405 |
| | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 NOV 21 PM 2: 52 | | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

FILED
NOV 21 2000
Judge Harry D. Leinenweber
U. S. District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: GENERAL INSTRUMENT
CORPORATION SECURITIES
LITIGATION

THIS DOCUMENT RELATES TO:
CLASS ACTION

Master File No. 96 C 1129

Judge Harry D. Leinenweber

DOCKETED
NOV 22 2000

## MEMORANDUM OPINION AND ORDER

Before the Court are three securities actions, all brought against General Instrument Corp. ("GI") and several of its directors and officers, which have been consolidated for coordinated pretrial proceedings pursuant to the Order of the Judicial Panel for Multi-District Litigation. This memorandum opinion and order only addresses defendants' motion for partial summary judgment as to the action brought by a class of GI shareholders.

### BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions. This is a securities fraud class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of persons, other than defendants and certain related parties, who acquired GI common stock between March 21, 1995 through October 18, 1995 and were damaged by the alleged fraud. (P. Resp. ¶ 11). During all

relevant times, GI was engaged in the telecommunications business, providing, among other things, communication systems and equipment. (P. Stmt. ¶¶ 1, 16). Among the products it offered in 1995 was an analog addressable set-top terminal, the CFT 2200. (P. Stmt. ¶ 1). GI promoted the CFT 2200 as the "next-generation" analog terminal that "transformed the usual tuner/de-scrambler installed in cable subscribers' homes into a broadband, multimedia computer," capable of delivering enhanced features such as an interactive program guide ("IPG"). (P. Stmt. ¶ 52; D. Stmt. ¶¶ 15-16). As of March 1995, GI had entered into purchase agreements for over a million CFT 2200 units from Time Warner Corporation alone. (P. Stmt. ¶ 55).

**March 1995 Statements**

On or about March 21, 1995, GI filed its 1994 Annual report and Form 10-K. (P. Stmt. ¶ 64). The 1994 Annual Report stated with respect to the CFT 2200:

> Our customers showed strong acceptance of our next-generation analog addressable set-top terminal, the CFT 2200. This terminal, which provides an advanced electronic program guide and other enhanced consumer features, has been ordered in significant quantities by Time Warner, Continental Cablevision, and other major cable network operators.
>
> * * * *
>
> Recognizing the viability and longevity of analog networks, GI has developed a feature-rich, highly functional advanced analog addressable terminal. The CFT 2200 delivers enhanced messaging, multilingual displays and an interactive program guide. Subscribers use cursor keys to navigate through program

offerings. The CFT 2200 also makes possible
near-video-on-demand, supporting simultaneous
delivery of many pay-per-view movies.

(P. Stmt. ¶¶ 66-67). The Form 10-K also contained statements about the CFT 2200:

> The Company has continued to increase the functionality and features of its analog addressable subscriber terminals. Its latest product, CFT 2200, scheduled to begin shipment in the second quarter of 1995, incorporates a user feature platform that will allow the cable operator to write applications for new services including electronic program guides, supplementary sports and entertainment information and play-along game shows. This addressable terminal can be modularly upgraded to deliver digital audio, providing CD-quality simulcasts of premium services, and can also be upgraded to GI's DigiCipher II digital compression technology.

(P. Stmt. ¶ 69).

An outside analyst research report also stated that

> [GI] will begin shipping [the CFT 2200] in a few weeks and believes it will be capacity constrained through 1996. We currently estimate that the company will ship 750,000 units in 1995 and over 1 million in 1996.

(P. Stmt. ¶ 70).

While GI was making these public statements, internal company documents - submitted to this Court under seal - reveal that GI had entered into an amended purchase agreement with Time Warner that conditioned acceptance of any delivered CFT 2200 units on the presence of certain features, including the interactive program guide ("IPG"). (P. Stmt. ¶ 77). The internal reports also document the slow and trouble-filled production of various touted

- 3 -

features of the CFT 2200, including the IPG feature. (P. Stmt. ¶ 73-79).

**April 1995 Statements**

In mid-April, GI issued a Prospectus in connection with a proposed secondary offering of 15 million shares of the Company's common stock. (P. Stmt. ¶¶ 89-91). The Prospectus included the statement that GI's CFT 2200s were "scheduled to begin shipment in the second quarter of 1995." (P. Stmt. ¶ 91).

That same month, GI company officers participated in a road show and a conference call with analysts for the secondary offering. (P. Stmt. ¶ 80-81). Materials from the road show and conference call contain statements that GI "started shipping its advanced analog converter - the CFT 2200 - in fulfillment of customer commitments for 2.1 million units to date." (P. Stmt. ¶ 80). And that

> the next generation of advanced analog terminals - our CFT 2200 - is just now being deployed. These terminals add increased functionality, two-way capability and, importantly, advanced program guide capability to today's video network. And in this product category GI is number one, capturing market leadership at cable companies such as Time Warner, the major proponent of this product category, and at GTE, which will deploy advanced analog product as well as digital product in their network.

(P. Stmt. ¶ 83).

At the same time, internal GI documents continued to report GI's difficulty with integrating an IPG feature acceptable to Time

Warner in time to meet the delivery schedules set by the purchase agreement. (P. Stmt. ¶¶ 92, 102). Furthermore, the documents show that only "base" and "sample" CFT 2200 units were being shipped in the second quarter. (P. Stmt. ¶¶ 92, 99, 100) As of this time, base CFT 2200 units were not equipped with some of the advertised features, but did include the capacity to be upgraded through downloadable software. (P. Stmt. ¶ 95; D. Resp. ¶ 95).

### June 1995 Statements

According to analysts notes and reports from a June 1995 Technology Conference, GI apparently stated that "business continues on track" and that "volume production on the next generation analog set-top converter [would begin] this month." (P. Stmt. ¶ 104, 105).

### July 1995 Statements

On July 19, 1995, GI released a press release which stated:

> General Instrument's record sales and operating income demonstrate our success in delivering broadband information systems to customers around the globe . . .. We are particularly pleased with the growing acceptance of General Instrument's advanced analog and digital broadband systems by network operators and programming customers.

(P. Stmt. ¶ 110).

During a conference call with analysts on the same date, GI officials remarked, "Our expectation is that before the end of this year, we'll have shipped more than 800,000 [CFT 2200] units and then, we're in – full production mode and shipping

at . . . whatever rate the customer demands, and right now that is looking very good for us." (P. Stmt. ¶ 113).

Meanwhile, contemporaneous internal GI reports indicated that GI was still struggling to produce a CFT 2200 unit acceptable to Time Warner. (P. Stmt. ¶ 114-19). Furthermore, "firmware" problems required GI to recall delivered CFT 2200 units and rework them. (P. Stmt. ¶ 122-23). On the other hand, an internal sales volume estimate, dated July 18, 1995, set the estimated sales volume for "analog addressable CFT" at 856,6000 units. (D. Stmt. ¶ 42). However, in a July monthly report, issued in mid-August, GI came to the conclusion that "[a] fresh look at 1995 volumes indicate that [GI is] closer to shipping 525 K units into the marketplace vs. the previous estimate of 825K." (P. Stmt. ¶ 125). Consequently, on September 11, 1995, GI publicly revised its estimated sales volume of CFT 2200 units downward from 800,000 to 500,000 units. (P. Stmt. ¶ 130). The price of GI stock declined in the two days following the correction. (P. Stmt. ¶ 132-33).

## DISCUSSION

Summary judgment shall be granted if the pleadings along with the supporting documents "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, a trial court must view the record and all reasonable inferences drawn therefrom in the light

most favorable to the non-moving party. *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir. 1990). However, a party opposing a properly supported motion for summary judgment cannot rest upon mere allegation or denials, but must present affirmative evidence in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

Defendants seek partial summary judgment as to the Class's claims brought pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, regarding GI's allegedly fraudulent representations about its CFT 2200 product. To establish liability under the Securities Exchange Act of 1934 for fraudulent or misleading statements, the plaintiff must show that in connection with a securities transaction, the defendant either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading. *Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995). In light of these standards, the Court examines each of the allegedly false or misleading statements in turn.

### March 1995 Statements

The first of the allegedly fraudulent statements were disseminated through GI's 1994 Annual Report and Form 10-K, issued on March 21, 1995. In the Annual Report, GI stated:

> Our customers showed strong acceptance of our
> next generation analog addressable set-top

- 7 -

> terminal, the CFT 2200. This terminal, which
> provides an advanced electronic program guide
> and other enhanced consumer features, has been
> ordered in significant quantities by Time
> Warner, Continental Cablevision, and other
> major cable network operators.

(D. Ex. A at 3).

> Recognizing the viability and longevity of
> analog networks, GI has developed a feature-
> rich, highly functional advanced analog
> addressable terminal. The CFT 2200 delivers
> enhanced messaging, multilingual displays and
> an interactive program guide. Subscribers use
> cursor keys to navigate through program
> offerings. The CFT 2200 also makes possible
> near-video-on-demand, supporting simultaneous
> delivery of many pay-per-view movies.

(D. Ex. A at 14).

Furthermore, in its Form 10-K, GI stated:

> [T]he Company has continued to increase the
> functionality and features of its analog
> addressable subscriber terminals. Its latest
> product, the CFT 2200, scheduled to begin
> shipment in the second quarter of 1995,
> incorporates a user feature platform that will
> allow the cable operator to write applications
> for new services including electronic program
> guides, supplementary sports and entertainment
> information and play-along game shows.

(D. Ex. B at GI004433).

Shortly thereafter, Bears Stearns issued a report stating that "[t]he company will begin shipping this new product in a few weeks and believes it will be capacity constrained through 1996."

(P. Ex. 833 at GI002196).

According to the Class, the foregoing statements were meant to convey to the public that GI had, as of March 21, 1995, fully

- 8 -

developed the CFT 2200 and that the product was presently available with the numerous new features already integrated into the product. However, contemporaneous internal documents suggest that production of certain CFT 2200 features, such as the interactive program guide ("IPG"), were still evolving, and customers, such as Time Warner, refused to accept any CFT 2200 units without the IPG feature. Therefore, the Class argues, GI's March 1995 statements that (1) GI's customers demonstrated "strong acceptance" of the product, (2) that the CFT 2200 was "feature-rich" and "highly functional", and (3) that the product was scheduled to ship in a few weeks were false and misleading.

But the Class makes more out of the March statements than the words can reasonably bear. As a preliminary matter, the Bears Stearns report, promising shipment in a few weeks, cannot be used as the basis of a fraud claim since the report is hearsay and no evidence is presented that the report is otherwise admissible. *See generally, Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997). Furthermore, nothing in the cited evidence supports the Class's contention that as of the March statements, it was unreasonable to expect shipment of CFT 2200 units to begin in the second quarter of 1995 as stated in the Form 10-K. Indeed, a February monthly report confirms that GI expected "full-scale" roll-out to begin in mid-March and to reach a crescendo in May and June. (P. Ex. 103, GI 0013581).

Second, GI's representation that its customers showed "strong acceptance" of the CFT 2200 product is nothing more than vague "puffery" and is not a material statement of fact sufficient to support the Class's claim of fraud. See Searls, 64 F.3d at 1066. GI makes much of the fact that Time Warner, undeniably GI's largest customer for the CFT 2200, insisted upon a clause in its purchase agreement that it would not accept CFT 2200 units without an IPG feature. However, GI's March statements do not promise that each and every unit sold to a particular customer would be found acceptable to that particular customer in accordance with the terms of a specific purchase agreement. Instead, the claim of "strong acceptance" is more reasonably understood to indicate strong customer interest, a claim that GI was entitled to make given the uncontested fact that Time Warner and other customers had in place purchase agreements for millions of CFT 2200 units. (D. Ex. C at TWC 2005; D. Ex. D).

The Court also finds nothing in the March statements assuring the public that GI had, as of the statement, successfully produced a fully loaded CFT 2200 unit with all the touted features, such as the IPG. GI's slow incorporation of various features into its CFT 2200 does not contradict its representation that it had "developed" a "feature-rich, highly functional" CFT 2200 product. The term "developed" is not necessarily synonymous with having produced a fully working product.

Furthermore, the statements are consistent with an understanding that what made the CFT 2200 truly "feature-rich" and "highly functional" was not the presence of certain individual features, but the unit's ability to easily and conveniently expand in features as various individual cable operators saw fit. The Form 10-K clarifies that the "CFT 2200 . . . incorporates a user feature platform that will allow the cable operator to write applications for new services including electronic program guides. . .." (D. Ex. B at GI 004433). The Class's own cited deposition testimony confirms this understanding of the CFT 2200. A Time Warner representative testified that,

> . . .one of the biggest feature of the CFT 2200 is the ability to download software into the box, and hence take on different characteristic, things such as it now has an interactive guide while the previous product did not have an interactive guide.
>
> ****
>
> . . .there's a distinct difference between the CFT 2000 box [the previous generation product] and the CFT 2200 box. The CFT 2200 you could put - you could reload new software, and the CFT 2000, you would not be able to. So the CFT 2200 used in the previous mode from that standpoint is very different in that I could upgrade without - without rolling a truck. It was a piece of code I could send down, and it will take on different characteristic.

(Hayashi Dep. at 50, 131-132). As such, the fact that certain features, such as the IPG, were integrated slowly into particular CFT 2200 units does not render GI's March statement that it had developed a "feature-rich, highly functional" product fraudulent.

## April 1995 Statements

The Class next alleges that statements made in April 1995 in conjunction with a Secondary Offering of GI stock are actionable. In a April 17, 1995 conference call with analysts regarding GI's first quarter results, a GI official stated that the company had "started shipping its advanced analog converter - the CFT 2200 - in fulfillment of customer commitments for 2.1 million units to date." (P. Ex. 870 at GI 003946). The Class also quotes from the script of a slide presentation given by GI officials during a road show promoting the secondary offering. The script states, among other things, that

> the next generation of advanced analog terminals - our CFT 2200 - is just now being deployed. These terminals add increased functionality, two-way capability and, importantly, advanced program guide capability to today's video network. And in this product category GI is number one, capturing market leadership at cable companies such as Time Warner, the major proponent of this product category, and at GTE, which will deploy advanced product as well as digital products in their network.

(P. Ex. 869, GI 0024589).

A Prospectus for the secondary offering, filed on April 21, 1995, also states,

> . . .the Company has continued to increase the functionality and features of its analog addressable subscriber terminals. Its latest product, the CFT 2200, scheduled to begin shipment in the second quarter of 1995, incorporates a user feature platform that will allow the cable operator to write applications

> for new services, including electronic program
> guides, supplementary sports and entertainment
> information and play-along game shows. The
> addressable terminal can be modularly upgraded
> to deliver digital audio, providing CD-quality
> simulcasts of premium services, and can also
> be upgraded to GI's DigiCipher-Registered
> Trademark-II digital compression technology.

(P. Ex. 143 at 22).

Citing internal documents that again reveal the slow integration of a "full-featured" IPG application in to the CFT 2200 units, the Class asserts that the foregoing statements falsely suggest that the development of the CFT 2200 had been completed. However, the Court finds that the April 1995 statements, as with GI's March representations, cannot be reasonably understood as promising that the CFT 2200 units were being produced with all of the individual features mentioned. For example, the slide presentation states merely that the CFT 2200 terminals provide advanced program guide "capability." (P. Ex. 869, GI 0024589). And if there were any doubts, the contemporaneously filed Prospectus copies the language of the earlier Form 10-K, stating that "the CFT 2200 . . . incorporates a user feature platform that will allow the cable operator to write applications for new services, including electronic program guides. . .." (P. Ex. 143 at 22-3); see *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529-30 (7th Cir. 1985)("The securities laws are designed to induce issuers to commit their representations to writing, and judicial use of the writings as the authoritative disclosure

promotes certainty and thus planning. When the issuer discloses the truth, an oral variance is not a legal cause of the injury.") Accordingly, the Class cannot sustain a fraud claim based on the April 1995 statements.

On the other hand, the Court finds a material issue of fact as to whether GI had, in fact, "started shipping" CFT 2200 units "in fulfillment of customer commitments for 2.1 million units to date." While the record indicates that some CFT 2200 units were being moved around, the plaintiffs sufficiently raise the possibility that, at the time of the statement, only "base" or "sample" units had been sent to be tested by customers and that if any "shipments" occurred, it was between GI's factories and its headquarters or warehouses. (P. Mem. at 10). If that is the case, GI's statement that it had started shipping to customers in fulfillment of their orders is misleading.

### June 1995 Statements

The Class also alleges that certain statements made by GI officials to analysts in June of 1995 were fraudulent. According to notes and reports of analysts attending a June Technology Conference, officials from GI supposedly stated that "business continues on track" and that "volume production" of the CFT 2200 would occur during June 1995. (P. Ex. 825; P. Ex., 819). But because these statements are hearsay, and the Class offers no evidence of their reliability or admissibility on any other

grounds, they cannot form the basis of a fraud claim. *Eisenstadt*, 113 F.3d at 742 (". . . hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial . . ..")

### July 1995 Statements

Finally, the Class challenges certain July 1995 GI statements. In July 19, 1995, GI released a press release which stated,

> General Instrument's record sales and operating income demonstrates our success in delivering broadband information systems to customers around the globe . . . We are particularly pleased with the growing acceptance of General Instrument's advanced analog and digital broadband systems by network operators and programming customers.
>
> During the second quarter, General Instrument began the initial rollout of its CFT 2200 advanced analog systems. With recent commitments from TKR Cable and Cablevision Systems, combined with awards from Time Warner, Continental Cable and Optus Vision, General Instrument has received customer commitments for over 3.5 million CFT 2200 terminals.

(P. Ex. 42, FLK 000158)

At about the same time, GI officials participated in a conference call with analysts during which they stated:

> General Instruments began the initial roll-out of its CFT 2200 advanced analog system during the second quarter. Customers here included Time Warner. . ..
>
> GI has significant number of major new products, which will impact our orders going forward. One of these is the CFT 2200 advanced analog converter that we've been

- 15 -

>   discussing. GI has now shipped initial orders to customers and expect significant additional orders, based on increased customer commitments. . ..
>
>   Our expectation is that before the end of the year, we'll have shipped more than 800,000 units and then we're in full production mode and shipping at - the ra - whatever rate the customer demands, and right now, that's looking very good for us.

(P. Ex. 868 at 3-5, 45).

According to internal company reports, however, GI was continuing to struggle with integrating an IPG feature into the CFT 2200 unit that would be acceptable to Time Warner, and the difficulty was expected to delay volume delivery. (P. Ex. 108 at GI 0014405, 014409). Furthermore, GI encountered hardware and firmware problems that required the recall and reworking of all CFT 2200 units produced at that time, which numbered 180,000 units. (P. Ex. 108 at GI 0014409; P. Ex. 652, 656). Thus, in mid-August, GI internally concluded that "[a] fresh look at 1995 volumes indicates that we are closer to shipping 525K units into the marketplace vs. the previous estimate of 825K." (P. Ex. 109 at GI 0014274).

Relying upon these internal documents, the Class asserts that the July public statements were false since the CFT 2200 was not yet developed and the expectation of 800,000 units shipped by the end of the year had no reasonable basis. However, the statements do not mention the state of CFT 2200's development, and certainly do not mention the state of development of any particular feature

such as the IPG. Therefore, the fact that Time Warner and GI were struggling to come to terms with an IPG feature in satisfaction of their purchase agreement has no relevance for the truthfulness of the above statements.

But the Court is not prepared to close off litigation as to GI's sales volume estimation. GI's statement that it expected shipment of 800,000 units by the end of the year is a forward looking statement, actionable only upon the absence of a reasonable basis for the statement at the time it was made. *Searls*, 64 F.3d at 1066. The record raises an issue of fact as to whether GI had such reasonable basis.

In support of summary judgement, the defendants offer the affidavit of Richard Friedland, the GI official who made the statement, stipulating that his estimate was based upon a July 18, 1995 internal sales forecast. Friedland attaches a document which estimates the 1995 sales volume for "analog addressable CFT" at 856,000 units. (D. Ex. T at Ex. 1). The plaintiffs, however, counter that Friedland had available other information that should have made him think twice about the rationality of such a forecast, including the delay in volume shipment to Time Warner due to repeated failures of acceptance tests as well as the firmware and hardware problems that required the reworking of all CFT 2200 units produced to date. These facts appear to be in stark contrast to Friedland's unequivocal confidence on July 19, 1995 that ". . . we're in full production mode and shipping at . . . whatever rate

the customer demands, and right now, that's looking very good for us." The Court agrees that this raises a material issue of fact as to the reasonableness of Friedland's July statements. Accordingly, summary judgement as to Friedland's July 1996 statements must be denied.

## CONCLUSION

For the reasons stated above, defendants' motion for partial summary judgment against the Class is granted ~~in part~~ and denied in part.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date: November 21, 2000